**In The**

*Court of Appeals*

*Ninth District of Texas at Beaumont*

_____

**NO. 09-20-00093-CV**
_____

**MAGNUM AIR, INC., GAMMA CONSTRUCTION CO.,
COLONIAL AMERICAN CASUALTY AND SURETY COMPANY,
AND FIDELITY AND DEPOSIT COMPANY OF MARYLAND, Appellants**

**V.**

**MAVEN MECHANICAL, LLC, RALPH WHEELER, AND
MATTHEW JANECEK, Appellees**

━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━

**On Appeal from the 284th District Court
Montgomery County, Texas
Trial Cause No. 16-05-06217-CV**

━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━

**MEMORANDUM OPINION**

Following a jury verdict in favor of Maven Mechanical, LLC ("Maven") and against Magnum Air, Inc. ("Magnum"), the trial court signed its final judgment, titled Final Judgment Nunc Pro Tunc, on the jury's verdict against Magnum, Gamma Construction Co. ("Gamma"), Colonial American Casualty and Surety Company

1

("Colonial"), and Fidelity and Deposit Company of Maryland ("Fidelity").[1] Magnum filed a motion for new trial, which was denied. In four issues, Magnum challenges the trial court's denial of its Motion for New Trial and contends: (1) the evidence was legally and factually insufficient to support the jury's findings that Magnum breached the contracts first; and (2) the evidence was legally and factually insufficient to support the jury's findings that it suffered no damages resulting from Maven's breach. In its second issue, Magnum argues the trial court abused its discretion by denying its Motion for New Trial based on conflicting and contradictory answers to issues by the jury in the jury charge. In its third and fourth issues, Magnum conditionally contends that if we sustain its first and second issues, then the derivative bond claims and attorney's fee claims are without legal support. We overrule the first two issues and affirm the judgment of the trial court.

## I. Background

### A. Parties' Relationship

Pipefitters by trade, Ralph Wheeler and Matthew Janecek decided to start their own company, Maven. They began bidding jobs for Magnum, a commercial HVAC contractor, as Janecek had worked with William Fincher, Magnum's Vice President, on other projects when they were employed for different contractors. Magnum

---

[1] Defendants/Counter-Plaintiffs nonsuited their counterclaims against Wheeler and Janecek individually along with their conversion claim against Maven.

primarily did school construction jobs, because the "money is pretty much guaranteed."[2]

In 2014 and 2015, Maven and Magnum executed contracts on four individual projects at issue in this litigation. These projects included three schools: Creekside Park Junior High in Tomball, Katy Elementary 38, and Katy Elementary 39. The fourth project was St. Luke's United Methodist Church. A Master Subcontract Agreement ("MSA") executed in 2014 governed the parties' work.[3] Additionally, separate "[W]ork [A]uthorizations" containing identical terms, except for the scope of work and contractual amount to be paid, covered each individual project. Each work authorization included a provision requiring Magnum to provide Maven with a job schedule. A "pay when paid" provision requiring Magnum to pay Maven once it received payment from the general contractor also applied to all the projects.

As the projects progressed, Maven fell further behind on its scheduled completion date, with each party attributing the delays to different reasons. In January, Magnum began requiring Maven to add significant manpower to the jobs to overcome the delays. Magnum paid Maven at the end of each week for these additional labor charges but deducted those amounts from the overall payment

---

[2] *See generally* Tex. Gov't Code Ann. § 2253.001 (defining various terms pertaining to public work performance and payment bonds).

[3] During trial, the parties also referred to this as the "Master Services Agreement."

installments owed to Maven under their contract. Maven began experiencing difficulty paying its vendors, and Magnum began withholding Maven's payments under the auspices of auditing their accounts, as was contractually permitted.

Because of increased tensions on the jobs, Maven requested a meeting with Magnum, which took place on April 20, 2016. At the time of the meeting, Maven had not received payments from Magnum for work performed in February and March, although Magnum had been paid by the general contractor for each of these months. Additionally, Magnum put Maven's January payment for Creekside on hold to audit the account. At the meeting, Magnum had several checks ready for Maven; however, Maven advised Magnum they would be unable to continue the jobs given the payment situation. The parties disagreed on whether Maven refused to accept the checks or whether Magnum refused to hand over the checks. After the April 20 meeting, Magnum took over each of the jobs for Maven and hired Maven's workers as their own to complete the projects. Magnum also agreed to hire Janecek and Wheeler to help finish the jobs.

Following the conclusion of these projects, both parties filed multiple lawsuits in various jurisdictions against each other. The lawsuits were ultimately consolidated into one suit in Montgomery County, Texas, with Maven designated as the Plaintiff and Counter-Defendant and Magnum designated as the Defendant and Counter-

Plaintiff. Although the parties pleaded multiple causes of action, the primary dispute dealt with competing breach of contract claims.

**B. Evidence at Trial**

### 1. Matthew Janecek's Testimony

Janecek, one of Maven's owners, testified that Maven and Magnum executed an MSA dated April 15, 2014. Janecek testified the MSA covers any job Maven does for Magnum, which has terms that apply for every project. Work authorizations are executed for each individual project awarded Maven under the MSA.

Janecek testified adverse weather caused significant delays on the two Katy projects and the Tomball Creekside project. Janecek said with the school projects, there is a firm start date and finish date, so even if the project starts late or experiences delays, the finish date does not change. If a delay occurs, contractors must then hire additional people to complete the job timely, which increases the contractor's costs and reduces any profit. Janecek testified that happened in this case, and Maven had to man the jobs with more people than they originally calculated when they made their bid for the project.

#### a. Katy 38 and 39

Janecek discussed the Katy 38 Elementary Work Authorization. Janecek testified that Maven's total contract price for Katy 38 was $540,000. Janecek testified that Item 13 on "Exhibit A" of the Katy 38 Work Authorization stated,

5

"Magnum Air shall provide you with a construction schedule. We expect you to ship and receive the equipment as to not delay the progress of the job." Janecek testified that Magnum Air never provided them with a construction schedule for the Katy 38 job. Janecek testified Gamma, the general contractor, held weekly meetings with foremen from the different trades, and "generally [had] a weekly schedule change as the job flows along. It's pretty much a living document. It changes from week to week."

Janecek said between the start of the Katy 38 project in June 2015 to April 2016, Maven "[r]eceived equipment, installed piping, ran mains, piped equipment, . . . and then purchased material as well." Janecek said Maven actually began their work in October 2015 and confirmed he submitted payment requests for October, November, and December, which Magnum paid. For Katy 38, Maven also received a January payment in the ordinary course of business. Janecek explained that it typically took forty-five to fifty days for Magnum to pay Maven's payment application.

Janecek testified that while the Katy 38 subcontract between Magnum and the general contractor Gamma had a construction schedule attached to it, that contract was never made available to him. Janecek conceded that the subcontract between Magnum and Gamma was a part of the MSA between Magnum and Maven and he never specifically asked to see the subcontract.

6

Janecek explained that Magnum's owner, Terry Tunning, felt Maven was behind "manpower-wise" on the Katy schools and told them to increase manpower, but Maven responded they did not have sufficient funds to do so. According to Janecek, Tunning specified a certain number of people he wanted on each job. Maven hired extra workers at Magnum's direction, and Janecek explained how Magnum reimbursed them for the extra charges but noted those amounts were deducted from the future payments due to Maven under the contract. Janecek explained that Magnum put some of their in-house labor on the job with Maven because they did not feel Maven had adequate manpower, then Magnum billed Maven for those employees. Janecek agreed the MSA permitted Magnum to take such action, as well as to make the back charges for additional labor. Janecek testified that in January and February, Maven had to increase manpower on Katy 38 and 39, and they were paid by Magnum after Magnum deducted the amounts due for the extra manpower. Magnum was paid in full for its billings to the general contractor.

Janecek said that through February and into March, their relationship with Tunning and Magnum was "pretty tense." He described many "hounding phone calls[]" saying Magnum felt Maven was behind on the various jobs, but Magnum never provided Maven a construction schedule. Janecek opined that Magnum just decided Maven was behind on its work. In March, Magnum continued to increase

7

pressure for extra manpower and, with the extra guys on the job, Janecek said it "was just killing us financially." As a whole, the projects were behind schedule, did not proceed in the customary order of construction, the various trades on each job piled up and they were getting in each other's way to try to complete the jobs. There were three main subcontractors under Magnum: piping subcontractors, sheet metal subcontractors, and insulators. Janecek testified that all those contractors working at maximum manpower hindered workflow because everyone "was running on top of each other, trying to get work done."

Janecek testified that in early April, Maven's relationship with Magnum worsened because Tunning wanted Maven to be further along on the jobs. Tunning sent "pretty dirty emails[]" telling Maven they needed to be at a certain place and threatened additional back charges and it was affecting their paychecks.

Maven received the January payment for both Katy schools in mid-March. Maven submitted a payment application in February and expected to receive payment in mid-April.

Janecek explained that Maven was waiting on pipe sleeves from the "galvanizer" in mid-March, but they went ahead and installed the pipe for the AC, so it would be functional while they waited. He agreed Maven "should have had some sleeves installed here and there, but they weren't impeding the progress of the job." According to Janecek, the sleeves were more of a code issue and did not

8

prevent the AC from working and, because they did not want to delay the job, they returned and installed the galvanized sleeves later.

Janecek testified regarding Magnum's April 20, 2016 invoice to Gamma for Katy 38, which was admitted as evidence. Janecek's testimony addressed each line item in Magnum's invoice that was for work completed by Maven. Janecek said the numbers Magnum certified to Gamma for Maven's completed work totaled approximately $570,000. Janecek confirmed Maven was not seeking damages or payment for work performed after they left or were forced off the job. Janecek testified there was an approximate balance of $120,000 of Maven's work remaining to be done when they left the job, which meant their work was already eighty percent complete for Katy 38.

Gamma's internal report admitted at trial showed Katy 38's contract price with Magnum as $3,172,960, and the adjusted price paid as $3,181,149, which meant Magnum received full payment for Katy 38 from Gamma. Janecek also discussed Maven's Katy 38 Job Summary admitted at trial, which showed a total amount Magnum paid to Maven on the Katy 38 project, the outstanding amounts that Magnum owed to Maven for that project, and the credits against those amounts that Magnum paid directly to suppliers on Maven's behalf and for extra manpower. Janecek testified that the net amount owed to Maven from Magnum on the Katy 38 project, after giving Magnum all allowable credits, was $129,414.16.

9

Janecek also testified regarding a Magnum document admitted as evidence purporting to show Magnum's alleged damages for the Katy 38 project. The document showed Magnum and Maven's contract value as $519,620 and total payments made to Maven in the amount of $170,875.13. It also showed Magnum incurred labor costs of $308,189.17 after April 18, 2016. This same document indicated Maven owed Magnum $241,486.63. Janecek disputed that amount and maintained that Magnum owed Maven about $129,000. Janecek disagreed with the amounts Magnum presented and specifically testified that the figures were inflated. Janecek explained that given that the job was already eighty-two percent complete when Maven was forced to leave the job, he did not believe the expenses shown to complete the job were reasonable.

A Magnum spreadsheet for Katy 39 showed an adjusted contract amount between Gamma and Magnum of $3,031,323, which was higher than the original contract amount of $3,021,648. Janecek testified to the Katy 39 Work Authorization, which showed a contract amount of $518,000. Except for the contract price, Janecek told the jury the terms of the Work Authorization were identical to Katy 38 Work Authorization. The Work Authorization required Magnum to provide Maven with a construction schedule for Katy 39, which Janecek testified Magnum failed to do.

Janecek also testified that if Magnum incurred penalties or delay damages on Katy 39, it would have been reflected in the documents, but nothing indicated that

happened. The Magnum spreadsheet showed that on April 14, Gamma paid Magnum for its February 25 invoice in the amount of $454,090, before Magnum met with Maven. Janecek explained the documents showed that on May 24, 2016, Gamma paid Magnum's March 24 invoice in the amount of $294,676. Janecek expected Magnum to pay Maven its portion in May when Magnum received payment from Gamma, but Magnum did not. Likewise, according to Janecek, on June 16, 2016, Gamma paid Magnum's April invoice in the amount of $251,980 and Janecek again expected payment in June, but Magnum did not pay Maven. For Katy 39, Magnum made payments to Maven through January. The payment requests for February, March and April totaled $260,612 and were not paid. Janecek confirmed a Maven Job Summary admitted during trial showed a net balance owed by Magnum to Maven in the amount of $88,120.86 on Katy 39, after crediting Magnum for payments made for extra labor and direct payments made to Maven's suppliers. Janecek testified Maven was only seeking damages for the amounts owed on Katy 39 as outlined in the Job Summary and nothing over those amounts. Janecek testified that at the time of Magnum's April 2016 pay application for Katy 39, Maven's work was eighty-eight percent complete for that job, with approximately $74,000 remaining on the contract.

Janecek also testified regarding a Magnum document admitted which showed accrued expenses for Katy 39 after April 18, 2016. Specifically, he disputed the

11

amounts the document showed and explained why he disagreed with Magnum's numbers. Janecek estimated Maven's labor costs on Katy 39 were $130,000 to $140,000, and Magnum showed $220,126.21, but when Magnum took over the project from Maven, only two to three months remained on that job. Janecek acknowledged that the April pay applications for the Katy schools were sent to Magnum's lawyers and were not sent in the ordinary course of business.

### b. Creekside

Janecek testified that the Creekside Work Authorization reflected a contract price of $615,000 and required Magnum to provide Maven a construction schedule, which Magnum failed to do. For Creekside, Janecek said the January 8 payment application in the amount of $45,950 was the first one Magnum did not pay. Janecek explained that when he emailed Tunning about the missing payment, Magnum claimed the account was under audit but never provided Maven with any audit results. Janecek said that Maven expected to receive the January payment in March. A Maven Job Summary for Creekside was admitted and showed its unpaid pay applications, which Janecek explained to the jury.[4] Janecek testified that the outstanding payment applications for Creekside totaled $52,950, and after crediting

---

[4] Janecek explained that on the Maven Job Summary documents admitted at trial he incorrectly entered "May" and it should be "April" for the last month's pay applications.

Magnum for direct payments to suppliers, the net amount Magnum owed to Maven was $12,411.68.

Janecek explained that

Tomball Creekside . . . I believe it was in December, [Magnum] said that the general contractor said that we were behind and they wanted AC and so he had told us we had to work about two weekends in a row with just everybody we had on staff and then he filled the job with whoever was on his payroll at the time and -- basically, in one weekend, he -- just his labor was about a 50,000-dollar back charge. And then our own labor cost us close to about 35- to 40,000.

Janecek testified that this back charge had a "[p]retty devastating" effect on their business. He further testified that

$50,000 just got sucked out of our contract overnight. Now, he did agree to break that back charge up into three different -- remove it three different times, so it wasn't one hit, but I still had to pay our guys that - - it was a weekend, a week and then a week. And it added up to about 30 -- 30-, 40-, $50,000. I mean, it was a very, very expensive weekend, and that came directly out of our pocket. So money we had allocated to other things had to -- you have to pay your guys.

He said all the other contractors were behind on the Creekside project. By mid-April, Maven's financial situation was "very bad" due to the $50,000 in back charges; they needed to pay suppliers and employees, and by April, they had not received the January payment for Creekside. Janecek testified the outstanding payment was abnormal because they should have received it in mid-March. The January payment was the last payment received from Magnum for the Creekside job.

13

At one point, Janecek admitted writing an email acknowledging where he fell short on the Creekside job and, as an example, cited problems obtaining steel and parts from the galvanizers in a timely fashion from suppliers. He agreed Maven was responsible for installing the sleeves and that Maven delayed that process by several weeks. He explained he wrote the email to Tunning "to settle him down[]" with the hope Maven could get paid.

Janecek testified he felt Magnum's cost assessment to finish the job after Maven was forced off the job was too high; they were just down to "punch list items" when Maven left. Janecek also disputed a Magnum document admitted at trial which purported to show Magnum's damages. Magnum's document showed that Maven owed it $65,518, and Janecek countered that Magnum's figure for additional labor cost in the amount of $61,549 to complete punch list items was not a fair and accurate representation of the labor needed to finish those items.

### c. St. Luke's

Janecek testified the St. Luke's Work Authorization reflected a contract price of $372,000 and required Magnum to provide Maven a construction schedule, which it never did. Additionally, documents admitted showed $9,000 was owed by Magnum to Maven, the amount Janecek said they were seeking as damages in the lawsuit.

14

Janecek disputed Magnum's figure for labor costs of $42,000 reflected in Magnum's documents admitted at trial. Specifically, he testified that amount did not accurately reflect the cost to complete the job after Maven left. Janecek testified that a Magnum document showing a cost of $670,006.04 to complete Maven's work on the projects surprised Janecek as nobody had ever contacted Maven to complain about any defective work on any of the projects.

### d. April 20, 2016 Meeting

Janecek testified that around April 20, 2016, Maven called a meeting with Magnum. Janecek told Tunning and Fincher, "we couldn't continue to go forward with the payment situation we were in." Janecek testified that during the meeting, Magnum told them they had the checks, but Janecek said they needed to talk about some things first. Janecek further testified that Tunning slid the checks back, and Janecek testified "we discussed where we were and how we didn't feel we had – had gotten schedules on the jobs." Janecek explained,

> And at the time, we were responsible for, you know, 30 plus guys' employment. And so he had agreed that if we would -- if Scooter and I would stay on the jobs and work as hourly employees, that he would make sure all of the -- the invoices that we had -- outstanding invoices were met.

The parties agreed that Wheeler and Janecek would come on and help finish the jobs under the condition that Magnum would also take care of Maven's suppliers' invoices. According to Janecek, Tunning responded that he would be taking over the

15

jobs, making it clear Maven was out after this meeting, and Magnum took over Maven's employees. Janecek testified that if Maven had been timely paid by Magnum for the outstanding payments due, they would have been able to operate and could have completed the projects. Janecek added that while he was supposed to personally be paid $1300 or $1400 per week by Magnum for his work after Magnum took over, Tunning did not pay him, and he filed a Texas Workforce Commission claim against Magnum.

### e. Other Testimony

Janecek agreed that All-Tex Pipe obtained a judgment against Maven exceeding $100,000, which Maven is paying off. Janecek testified that Ameripipe also filed a lien against the projects and sued Maven for materials provided on Katy 38, 39, and St. Luke's in an amount exceeding $250,000. Janecek acknowledged that Maven owed Ameripipe for materials going back to January 2016. Janecek testified that Ahern, who rented equipment to Maven, also sued Maven for over $18,000 for invoices dating back to 2015. Janecek said that the records showing Maven's last payment to Ahern being in 2015 were not consistent with his recollection. But he did agree that he sent to Magnum unpaid invoices from suppliers on April 26, 2016, after Maven left the various jobs, and agreed those were invoices Maven was duly indebted to pay. Some of those invoices dated back to December 2015.

16

Finally, Janecek explained he sent an email to Tunning accepting responsibility for everything "to settle [Tunning] down[]" so Maven "could get paid[,]" and they planned to continue the jobs. Janecek testified that Maven did not complete the four projects, so Maven was not seeking the full contract price for the jobs. Janecek testified that Magnum never advised Maven of any delay damages incurred or charged to Magnum on any of the projects.

## 2. Ralph "Scooter" Wheeler's Testimony

Ralph Wheeler, a co-owner of Maven, testified he was on site every day and handled most of the field supervision, while Janecek handled the office work.

### a. Katy 38 and 39

For the two Katy schools, Wheeler said his duties were to "manage the people on the job, keep up with the job, make sure we're getting done what we need to get done." He also worked alongside their employees. Wheeler indicated that except for rain delays, the problems encountered on these jobs did not differ from other jobs. Wheeler said the jobs were to begin in October or November but could not, due to excessive rain. This meant they had to work more weekends, more hours, and with more people than when they originally bid for the jobs. That overtime impacted the company because Magnum did not cover overtime, and Maven had to eat those costs.

Wheeler testified that before the jobs started, they were never given any kind of schedule, and he never saw a piece of paper showing them "when" things were to

be done. "Gamma Construction provided a schedule on the job when we started pre-construction, but Magnum never gave me a schedule." While he understood Gamma's general schedule, Magnum dictated Maven's specific schedule. When asked about the impact of not having a schedule on the job, Wheeler responded,

> Well, just because the general wants you to be somewhere at a certain time doesn't mean it's feasible. There's lots of factors that go into that. And we were keeping up with the pace of the job the whole time. And for somebody to say you're behind, that's just their personal opinion.

He testified that if Magnum had provided a schedule, they would have known they were behind schedule. Wheeler also said he was in some meetings where progress schedules were handed out, although Wheeler did not specify by whom.

Wheeler explained how other trades that they had no control over often impeded Maven's work progress. According to Wheeler, from a sequencing standpoint, certain things had to happen before they could do other things. When discussing the other subcontractors, Wheeler noted that "[e]verybody was frustrated. Just everybody was in one spot trying to work." He testified that on Katy 38, they worked hard and described some of the work Maven performed. Magnum wanted them to work ten hours a day, six days a week, which they did. In February, Wheeler went to Katy and began working a lot of hours there. In Wheeler's opinion, Maven had enough people to do the jobs, but they added five or six more people to Katy 38 and 39 at Magnum's request. Wheeler explained that the increased manpower demands were a "little unusual" in that they had never been expected to double their

18

workforce and work ten hours a day, which they did during February, March, and April on both Katy school projects.

### b. Creekside

Wheeler testified that Maven began working "a lot" of hours and overtime in January when they were told they were behind at Creekside. He also testified that at Creekside, when Maven left the job, there were only punch list items left to do, which meant only "less than" five percent of the work remained uncompleted.

### c. Meeting with Magnum and Other Testimony

Wheeler testified that at the April 20 meeting, they told Magnum they could not move forward any further with the payment situation like it was, and Tunning pulled the two checks he had on the table away from them. When asked if Maven had refused the checks at the April 20 meeting, Wheeler said, "[W]e wanted all the checks, not just two of them." Wheeler said he saw the checks on the table but did not see what they were for, and he assumed they were for January. After Maven mentioned the need for payment, the only option Magnum gave them was to have Magnum take over the jobs. They discussed Wheeler and Janecek staying on as Magnum employees at journeyman's scale and helping them finish the projects, while Magnum would take over the outstanding invoices for materials and rental equipment. Wheeler confirmed that Maven agreed to those terms. Wheeler said that if the payments had been made when due, Maven would have and could have

19

finished the jobs. Wheeler testified that he worked for Magnum two weeks, but they only paid him for one week.

Wheeler said while he never read the contract between Magnum and Maven, he understood it was a "pay when paid" contract. Wheeler explained that he has not read the contracts for their other jobs because Janecek "handles that." Wheeler denied telling Tunning or Fincher that Maven could not do the work anymore because of weather conditions but Wheeler did tell them the weather had put them behind.

Wheeler discussed some of the difficulties they had paying their suppliers and said that around the time of the April 20 meeting, two suppliers put a hold on any further credit for Maven. He also indicated one supplier had taken a judgment against them for non-payment and two others had sued Maven for non-payment.

### 3. William Fincher's Testimony

Fincher testified that he is Magnum's Vice President of Operations and forty-nine percent owner. He described the general construction sequence for the schools and explained that most of the HVAC is installed after the steel is erected but before the walls are built. He disagreed with Wheeler's testimony, noting if the HVAC goes in after the walls, it slows everything down. Fincher also disputed Wheeler's testimony that Maven had sufficient manpower on the jobs. He described the process for estimating man hours and labor in their industry.

### a. Katy 38 and 39

Fincher testified that Magnum estimated both Katy schools should have taken six months to complete, and a normal crew size should have been from eight to twelve employees for each Katy school. Fincher testified the Katy jobs were understaffed and when Magnum told Janecek that Maven needed more crew, Janecek said he could not afford the additional overhead. So, Fincher offered to help front the payroll of hiring the extra workers and then deduct the costs from Maven's contract amount. Fincher testified regarding his emails with Janecek, which were admitted as evidence, and noted Janecek's presence at coordination meetings for Katy 38 when scheduling was discussed. While he could not verify a written schedule was handed out at the meeting, schedules were "absolutely discussed." Another email admitted from Fincher to Janecek advised of job progress meetings on Katy 38 and 39 on alternating weeks, and Fincher testified the purpose of the meetings was to discuss scheduling.

Fincher confirmed that in March 2016, things were "tense" on Katy 38 and 39. Fincher testified that in March, the situation on the Katy projects required him to explain Magnum's progress to the general contractor, provide daily status updates, and assure Gamma they would have the air conditioning operational in a timely fashion.

Fincher testified that when Magnum took over the Katy 39 project, the building did not have running water installed and in working order. The installation of piping had to be completed and pressure tested, and "[t]here was a lot of work still to be done." He also said that the Katy 38 project was even further behind than Katy 39 when Magnum took over for Maven.

Fincher discussed Magnum's Katy 38 April 20, 2016 invoice[5] to Gamma, which was admitted at trial. He acknowledged that his certification that the work was eighty-two percent complete in that pay application was probably inaccurate. In the April 2016 invoice admitted at trial for Katy 39, Fincher confirmed he certified Maven's portion of the job was over eighty-eight percent complete, which he said was accurate. Fincher explained that Magnum's payment applications submitted to the general contractor were dependent upon information available at the time from other subcontractors and their best estimates on the information Magnum had at the time. Magnum's pay application to Gamma showed a substantial amount of the A/C work on the project was completed, which included that which had been performed by Maven. Despite this, according to Fincher, Maven told them at the meeting they did not want the checks for the work they already performed because it would not do them any good.

---

[5] The parties seemed to use the terms "invoice" and "pay application" interchangeably.

### b. Creekside

Fincher explained that he did not recall Magnum's exact numbers for Creekside, but he said for a junior high, the typical crew size is around fifteen individuals. Fincher testified that beginning in January 2016, the Creekside general contractor put Magnum's payments on hold due to delays in completing the HVAC portion of the contract.

Regarding the Creekside project, Fincher testified that as of March 28, 2016,

> [I]n order to complete the job, I would tell you that chill water was pretty much complete, but hot water still had some holes in it, still had some lacking issues that needed to be complete to be able to finish the hot water system. I can't recall exactly where the cooling tower yard was or the conventional water pipe, because I know when we started the air on that building in March, that we were using the -- utilizing the air cooled chiller that they had sitting outside, not the water cooled chillers. It was a duplex system.

According to Fincher, during March, things were "tense" on the Creekside project. Fincher testified that during that month, the general contractor's president called him daily regarding the Creekside project "chewing on" him, and Fincher had to walk through and provide him with daily updates. Fincher further testified that when Magnum took over Creekside from Maven, they were in the trim-out phase and a "considerable amount of work" had yet to be completed.

23

### c. St. Luke's

Fincher also testified regarding November emails from the general contractor on St. Luke's Church and attached a construction schedule, which he indicated was typical for these types of jobs. He explained that in this instance, the general contractor issued a full, revised schedule. Multiple emails showed delays in setting certain equipment on the St. Luke's project, for which Fincher faulted Maven. Fincher testified that when Magnum took over for Maven, St. Luke's was in the punch list phase, but they had to re-work some things because there were some lines piped backwards and other issues that had to be corrected.

### d. April 20 Meeting

Fincher described his version of the April 20 meeting as having been requested by Maven to discuss its inability to go forward on the projects because they could no longer afford it. Fincher testified that Magnum offered Maven the February funding checks, but Maven responded that the checks would not help, so they discussed options moving forward. They discussed Maven employees staying on the projects and becoming Magnum employees, which would help Maven employees get paid, but would also benefit Magnum by not having to remove those workers and replace them with new ones.

24

After the April 20 meeting, Magnum had to take over the four projects. Fincher described costs of labor and supplies Magnum began absorbing on Katy 38, 39, and Creekside to help Maven.

### e. Other Testimony

Fincher testified that in May 2016, he was notified a lien had been filed against the project for non-payment by Maven and they had received other "intent to liens" earlier from some of Maven's suppliers, which caused them concern, because they had already paid out some of those funds to Maven. He also confirmed that a lien affidavit Magnum received in July 2016, referenced invoices as far back as January 2016.

During trial, Fincher testified he did not have any scheduling paperwork available to produce. Specifically, when asked about Exhibit A, paragraph 13 of the Work Authorization contracts requiring Magnum to provide a schedule to Maven, he responded they did not have one. Although Fincher testified Magnum estimated six months of work at eight to twelve people on each of these jobs, he said he did not have any documents showing those estimations. Finally, Fincher said he did not recall receiving any written communication from Maven indicating that they were unable to work on the projects because of the weather conditions.

### 4. Terry Tunning's Testimony

Tunning testified he is the controlling owner of Magnum, and his son-in-law, Fincher, is the co-owner. He understood "pay when paid" to mean Magnum did not have to pay Maven until Gamma paid Magnum, but once Gamma paid Magnum, they were obligated to pay Maven. Tunning explained that Magnum paid Maven until they received intent to lien notices from Maven's suppliers showing outstanding amounts that remained owed, which they began receiving in January 2016 for monies owed from December 2015. Tunning denied putting Maven's payment applications on hold and said that he explained to them they were going to go through an audit process to see what Maven owed compared to what Magnum had already paid to Maven. Tunning said Magnum gave Maven notice in January they were going to audit them, but they did not hold the January payments.

#### a. Katy 38 and 39

Tunning testified that Gamma construction attached an initial schedule to their contract with Magnum, but Maven never asked to see those contract documents. Tunning testified that Plaintiff's Exhibit 8 summarized what Magnum submitted for payment to Gamma on Katy 38. Tunning explained that Gamma paid Magnum's January pay applications for Katy 38 and 39 on March 11, and Magnum paid Maven the January amounts for Katy 38 and 39. Tunning testified that on April 15, they

received the February payment for Katy 38, and the February check was one they had ready for Maven at the April 20 meeting.

Tunning explained that Gamma paid Magnum's April 20 invoice for Katy 38 on June 16, which included work performed by Maven, but Magnum did not have a billing from Maven and so, did not pay Maven. Tunning testified Magnum did not pay them because he received "intent to liens" from certain Maven suppliers. Tunning agreed that under the "pay when paid" provision, Magnum was supposed to pay Maven when Magnum was paid. Magnum usually received payment within forty-five to sixty days of submitting their payment applications to Gamma. Tunning did not dispute that Magnum did not pay Maven for any work in February or thereafter for Katy 38 and 39. Tunning testified that Magnum's February 25 application to Gamma for Katy 39 was paid on April 14, and they had Maven's check ready for Maven at the April 20 meeting but, when tendered, Maven refused the check.

Tunning testified regarding Magnum documents admitted at trial that showed the damages Magnum felt it was owed for the Katy 38 and 39 projects from Maven. Tunning explained that Katy 38 and 39 cost so much more to complete after Magnum took over the jobs because they ended up having to purchase extra materials and had to pay past due invoices from Ameripipe and All-Tex, suppliers that should have been paid by Maven.

27

**b. Creekside**

According to Tunning, the general contractor felt Maven was behind on the Creekside project in January 2016, and after Magnum researched it, Magnum agreed with Gamma. Tunning testified that the general contractor sent a 72-hour notice to Magnum, which they passed along to Maven because some of the items that needed to be completed or corrected were the responsibility of Maven. Tunning testified many of the items were not timely cured. Tunning further testified that as they approached April 20, Magnum was "still catching a lot of heat from [the general contractor] about the sleeves [not] being installed[]" and about three weeks after the 48-hour notice, and two weeks from the 72-hour notice, they still had not been installed. Emails from April 18 admitted at trial discussed an audit, which Tunning attributed to Magnum receiving intent to lien notices from vendors and Magnum wanted to confirm they were valid and that the invoices had not been paid, because that went to the bonding company. According to Tunning, the general contractor on Creekside had put Magnum's payments on hold because in the opinion of the general contractor, Magnum was not where they needed to be and intents to lien had been filed, so they wanted these items cleared up before payment was made. As a result, as of April 19, 2016, Magnum had not received its January payment for Creekside from the general contractor.

Tunning explained that Magnum received a check dated February 23 from the general contractor for Creekside's January work that included work performed by Maven, but Magnum did not pay Maven on its payment application. Tunning admitted Magnum did not follow the "pay when paid" contract provision for Creekside when it failed to pay Maven on its January payment application. Tunning justified Magnum's decision not to pay Maven's January Creekside payment application in February because "based on their own information, it appeared that we were very close on the funding as it was. We had intent to liens filed by suppliers and we were trying to identify where they stood in their contract versus what was truly owed." So, according to Tunning, Magnum held Maven's January Creekside payment while they audited the account.

Tunning testified that they received emails in May 2016 from the general contractor on Creekside regarding additional costs and wall patching that would be deducted from their contract amount, which costs and extra work Tunning attributed to be Maven's ongoing responsibility.

### c. St. Luke's

Tunning testified Magnum did not include the St. Luke's project in a 48-hour notice it sent to Maven but, after Magnum did its own investigation, it determined that Maven was also behind on the St. Luke's project. Tunning testified that

Magnum held back payments per the MSA on St. Luke's because they received notices of unpaid invoices from Maven suppliers on the project.

### d. April 20 Meeting

Tunning said Maven advised them at the April 20 meeting they were shutting down. Tunning testified he was aware Maven was having financial problems before Magnum withheld payments to Maven on the various projects. However, Magnum was current on their payments to Maven through the date of the meeting. Tunning said Magnum did not pay Maven because Maven came in to inform Magnum that they were shutting down. Tunning testified that Maven said those checks were not going to help. To Tunning, that meant Maven was so far in debt that those payments were not going to keep them afloat, which meant they were having trouble making their payroll. According to Tunning, he did not pull the checks back; Maven pushed them back to him at the meeting.

### e. Other Testimony

Tunning explained that on elementary school projects, Magnum typically contracted to install four major components of the HVAC systems: big equipment, controls, piping, and ductwork. Tunning said there was no weather delay request from Maven to them or else Magnum would have submitted it to the general contractor; by the contract documents, there had to be a certain amount of rain delays before you're allowed one rain day.

30

Tunning testified that Magnum sent Maven an email in March 2016 addressing three of the four jobs, which was admitted at trial, providing Maven a 48-hour default notice as required by the contracts, because they felt Maven was not adequately manning the jobs. Tunning testified that the defaults mentioned in this notice were not cured by Maven within the allowable 48 hours. Magnum eventually had to terminate Maven after they left the job. Tunning testified that Janecek responded to the 48-hour notice email, which was typical of him, and said he would get Tunning a list as soon as possible and thanked him for his help. Tunning testified that the emails showed that Maven appreciated Magnum's help and there was never any communication from Maven complaining of weather delays or accusing Magnum of non-payment. All such accusations and excuses arose only after the fact.

Tunning said the first time he saw Maven's April pay applications was when they were sent to his legal team, and they came without schedules attached. Tunning testified that the MSA permitted Magnum to withhold payment to conduct an audit and assess damages for any possible offset, which is what happened with these projects with Maven. Tunning admitted that he did not follow "pay when paid" but testified that Magnum had legitimate reasons to justify any delays in payment. Tunning also agreed there were other contract provisions Magnum did not follow with regard to these projects.

31

Tunning testified regarding Maven's contractual defaults on the projects. He described why Magnum was allowed to withhold Maven's payments under the contracts. Tunning testified that one of Magnum's contractual remedies when a subcontractor caused problems like Maven was to offset against the subcontractor's payment applications, which Magnum exercised in this case. According to Tunning, even after the offsets, Magnum still incurred damages in excess of the amounts withheld from Maven's payment applications, costs necessary to complete the work that should have been performed by Maven. Tunning testified Maven failed to complete their work in a timely manner pursuant to the contract as evidenced by the 48 and 72-hour notices provided to Maven, which specifically identified piping deficiencies. Tunning further testified that Maven failed to complete the work in proper sequence as specified by Magnum and the general contractors and he cited to the pipe sleeves and pressure testing as examples. Tunning said that Maven was directly responsible for delaying the timing and sequencing on each of these four projects. With respect to Maven's documents showing their damages, according to Tunning, they failed to credit Magnum for all costs and damages Magnum suffered. On cross-examination, Tunning verified that Magnum was never assessed any liquidated damages by the general contractor on any of the four projects.

Tunning discussed a May 3, 2016 email response to Janecek, wherein Maven forwarded certain unpaid invoices from their suppliers. Tunning responded that

Magnum would not pay for past due invoices incurred by Maven prior to the date Maven informed them it was shutting down. Tunning testified that for the four projects at issue, Maven failed to perform all services or work in a good and workmanlike manner pursuant to the MSA. He cited to problems with lack of manpower, timely payment of vendors, and the work performed by Maven to support his opinion. According to Tunning, after April 20, Magnum had to complete work Maven failed to perform and repair work that Maven had performed. Tunning testified that under the scope of work section, Maven failed to provide all labor, materials, and supervision necessary to complete the work on these four projects, which was why he sent the 48-hour and 72-hour written notices under the contracts. Tunning confirmed that Magnum had to withhold amounts from Maven to protect Magnum from loss, per the contract terms. Tunning explained that Magnum incurred other damages beyond those amounts withheld from Maven necessary to complete the projects.

### 5. Additional Witnesses

Jeffery Ward, a former Maven pipefitter, testified that he worked on the Katy 39 project. He eventually began working for Magnum when they took over the jobs. When he first arrived on the job, Ward noticed they were "a little behind." He explained he knew the project was behind because he assumed the school would open in August, which did not give them much time to complete the project. Ward

said the schedule was available on the job for everyone if they needed to see it, and specifically, the supervisors went to weekly foreman meetings where they discussed the schedule. When he started working for Maven, nobody told him what the schedule was, and it was not his job to attend the foreman meetings. According to Ward, Maven was understaffed for the project he worked on. There were only five employees on the project, and he felt ten were needed. When Magnum took over, they put more people on the job to get it moving at a faster pace, and the crew went from five to twelve or fifteen people. Ward testified there was not a lot of equipment for lifting heavy pipe onsite. When he arrived on the job, Ward estimated he had to repair 100 leaks and testified that some of the welds were of poor quality.

Jerry Fennessy, a field superintendent for Magnum, also testified with regard to each of the four projects and how far behind schedule each project was. Fennessy testified that Maven completed the St. Luke's project, and Magnum did not have to take over that project. Because of the delays, he pulled workers from other sites to complete each of these remaining projects after Magnum took them over. In his opinion, when he arrived on the jobs in April, Katy 38 was about forty percent complete and 39 was about fifty percent complete. He also went through Magnum's certifications to Gamma and explained why he disagreed with Magnum's completion percentages for certain line items.

34

### 6. Documentary Evidence[6]

Documents admitted at trial included the MSA, the Work Authorizations for each project, employees' timesheets, payment applications, invoices, and emails and text messages between the parties regarding delays as well as payments. The documentary evidence also included suppliers' invoices that went unpaid and notices to Maven and Magnum for materials on the various projects. Janecek explained that sometimes their scope of work changed and if so, they would receive a "change order" and if approved, it would add to the contract total, but if work was taken out of the contract, it was deducted from the total.

Documents showing Maven's overtime labor costs for the four projects were admitted. Both parties provided documents summarizing their alleged damages for each project. The exhibits admitted at trial showed Maven was seeking damages for its outstanding payment applications for work done before it left the jobs totaling $238,946.70. This included claimed outstanding amounts owed of: (1) $129,414.16 for Katy 38; (2) $88,120.86 for Katy 39; (3) $12,411.68 for Creekside; and (4) $9,000 for St. Luke's. The exhibits admitted at trial also showed Magnum claimed $670,006.04 in damages incurred to complete all the projects, broken down into the following amounts: (1) $241,486.63 to complete Katy 38; (2) $189,095.79 to

---

[6] Although many documents were admitted at trial, we delineate here only the documents relevant to Magnum's specific challenges to the jury's findings that it breached the contracts first and sustained no damages. *See* Tex. R. App. P. 47.1.

complete Katy 39; (3) $65,518.16 to complete Creekside; (4) $32,460.23 to complete St. Luke's; (5) $52,856.14 for an increased insurance premium; (6) $66,171.70 for additional overhead; and (7) $22,416.79 in attorney's fees.

## II. Standard of Review

When reviewing a trial court's ruling on a motion for new trial, we generally apply the abuse-of-discretion standard. *Manjlai v. Manjlai*, 447 S.W.3d 376, 379 (Tex. App.—Houston [14th Dist.] 2014, pet. denied). However, if the motion for new trial is based on a challenge to the sufficiency of the evidence supporting the verdict, we review the trial court's denial of the motion by applying the standard of review that corresponds to a sufficiency challenge. *See id.*; *see also Etheridge v. Opitz*, 580 S.W.3d 167, 177 (Tex. App.—Tyler 2019, pet. dism'd).

In reviewing legal sufficiency, we consider "whether the evidence at trial would enable reasonable and fair-minded people to reach the verdict under review." *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005) In a legal sufficiency review, we consider the evidence in the light most favorable to the jury's findings, crediting favorable evidence if reasonable jurors could and disregarding contrary evidence unless reasonable jurors could not. *See id.* at 824 (outlining standard of review); *see also Del Lago Partners, Inc. v. Smith*, 307 S.W.3d 762, 770 (Tex. 2010) (same). Regarding an issue on which the appellant had the burden of proof, the appellant must show "the evidence establishes, as a matter of law, all vital facts in

support of the issue." *See Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 241 (Tex. 2001). A party challenging the legal sufficiency of a finding on which it did not have the burden of proof must show no evidence supports the jury's finding. *Exxon Corp. v. Emerald Oil & Gas Co.*, 348 S.W.3d 194, 215 (Tex. 2011). "Jurors are the sole judges of the credibility of the witnesses and the weight to give their testimony." *City of Keller*, 168 S.W.3d at 819. Jurors may believe one witness and disbelieve another, and we do not substitute our judgment for the fact-finder's judgment. *Id.* "In reviewing a 'no evidence' point, we must view the evidence in a light that tends to support the finding of the disputed fact and disregard all evidence and inferences to the contrary." *Bradford v. Vento*, 48 S.W.3d 749, 754 (Tex. 2001) (citation omitted). "We must uphold the jury verdict if any reasonable version of the evidence supports it." *Anderson v. Durant*, 550 S.W.3d 605, 616 (Tex. 2018).

In reviewing the factual sufficiency of the evidence, we "must consider and weigh all of the evidence and can set aside a verdict only if the evidence is so weak or if the finding is so against the great weight and preponderance of the evidence that it is clearly wrong and unjust." *Dow Chem. Co.*, 46 S.W.3d at 242 (citation omitted). Unlike legal-sufficiency review, factual-sufficiency review requires us to review the evidence that both supports and contradicts the jury's verdict in a neutral light. *Samson Lone Star Ltd. P'ship v. Hooks*, 497 S.W.3d 1, 11 (Tex. App.— Houston [1st Dist.] 2016, pet. denied) (citing *Cain v. Bain*, 709 S.W.2d 175, 176

37

(Tex. 1986)). The trier of fact may choose to "'believe one witness and disbelieve others' and 'may resolve inconsistencies in the testimony of any witness.'" *Id.* (quoting *McGalliard v. Kuhlmann*, 722 S.W.2d 694, 697 (Tex. 1986)). Regarding an issue on which the appellant had the burden of proof, the appellant must demonstrate the adverse finding is against the great weight and preponderance of the evidence. *Dow Chem. Co.*, 46 S.W.3d at 242. Regarding an issue on which the appellant did not have the burden of proof, the appellant must demonstrate that the evidence to support the adverse finding is so weak as to make the finding clearly wrong and unjust. *Cain*, 709 S.W.2d at 176.

## III. Analysis

### A. Issue One: Sufficiency of the Evidence

#### 1. First Breach

For each project, the jury found that both parties failed to comply with the MSA and applicable Work Authorizations. The jury also found that for each project, Magnum breached the agreements first.

"It is a fundamental principle of contract law that when one party to a contract commits a material breach of that contract, the other party is discharged or excused from further performance." *Mustang Pipeline Co., Inc. v. Driver Pipeline Co.*, 134 S.W.3d 195, 196 (Tex. 2004) (citation omitted); *see also Bartush-Schnitzius Foods Co. v. Cimco Refrigeration, Inc.*, 518 S.W3d 432, 436 (Tex. 2017) (noting same).

38

The court's charge instructed the jury that a failure to comply with an agreement must be material, and the circumstances to consider in determining whether a failure to comply was material included:

> 1. the extent to which the injured party will be deprived of the benefit which it reasonably expected;
> 2. the extent to which the injured party can be adequately compensated for the part of that benefit of which he will be deprived;
> 3. the extent to which the party failing to perform or to offer to perform will suffer forfeiture;
> 4. the likelihood that the party failing to perform or to offer to perform will cure his failure, taking into account the circumstances including reasonable assurances;
> 5. the extent to which the behavior of the party failing to perform or to offer to perform comports with standards of good faith and fair dealing.

*See Mustang Pipeline*, 134 S.W.3d at 199 (citing RESTATEMENT (SECOND) OF CONTRACTS § 241 (Am. Law. Inst. 1981) (outlining factors to consider when determining materiality of a breach). The court's charge also instructed the jury regarding the duty of "good faith" and provided a definition. For each of the four projects, the jury expressly found that Magnum's noncompliance with the agreements was not excused.

Magnum's briefing focuses on Magnum's non-payment as breaches of the MSA and Work Authorizations and attempts to justify its non-payment by Maven's prior breaches, but evidence supports other breaches by Magnum prior to the withholding of payments to Maven. The documents admitted at trial showed that the Work Authorization for each project required Magnum to provide Maven with a

construction schedule. Maven, through Janecek and Wheeler's testimony, established that Magnum did not provide Maven a construction schedule for any of the projects, as was required by the written agreement. Likewise, Tunning and Fincher testified that they did not provide Maven with a construction schedule and no such documents were produced at trial. Maven attributed much of their problems completing the jobs to Magnum's failure to provide construction schedules. However, witnesses testified that weekly on-site meetings were held where scheduling and work coordination was discussed.

Janecek testified that he did not feel Maven was behind and that it had adequately supplied laborers for the jobs. Wheeler opined it was merely Magnum's "opinion" that Maven was behind. Janecek further testified that multiple crafts were trying to work on top of each other in a confined area, which led to problems of delays. Considering the parties' issues during construction on each project centered on delays and the snowball effects of those delays on labor costs, the cause and existence of which were disputed, a reasonable jury could have viewed Magnum's failure to provide construction schedules as a material breach of the agreements and that such failure played a significant role in creating the subsequent problems on the jobs suffered by Maven. *See STR Constructors, Ltd. v. Newman Tile, Inc.*, 395 S.W.3d 383, 388 (Tex. App.—El Paso 2013, no pet.) (noting where subcontractor's testimony indicated general contractor had improperly scheduled trades to work in

the same area interfering with its work "played a significant role in creating the situation that [the general contractor] now argues justified its termination of the contract").

Based on this evidence, a reasonable jury could have inferred that Magnum failed to comply with this provision of the agreements and such failure constituted a material breach of the contract. Viewing only the evidence that supports the jury's findings, as we must, we conclude that some evidence exists to support the jury's findings that Magnum materially breached the agreements first. *See Del Lago Partners*, 307 S.W.3d at 770; *City of Keller*, 168 S.W.3d at 824. Magnum has failed to show that no evidence supported the jury's findings that it breached the agreements first. *Exxon Corp.*, 348 S.W.3d at 215.

We now turn to the factual sufficiency of the evidence supporting the jury's findings that Magnum first breached the agreements. We examine all the evidence in a neutral light to determine if the jury's findings were so contrary to the "great weight and preponderance of the evidence that it is clearly wrong and unjust." *See Dow Chem. Co.,* 46 S.W.3d at 242 (citation omitted). Here, there was contradictory evidence regarding the parties' breaches and who breached first. Magnum tried to establish that Maven breached first by failing to adequately staff jobs or have materials onsite in a timely manner, in addition to Maven's failure to pay some of its suppliers. On the other hand, the testimony of Maven's witnesses generally was

41

that despite Magnum failing to provide them with a construction schedule as the Work Authorization for each job required, Magnum assumed Maven was behind schedule. Based on Magnum's claims regarding the scheduling delays, it required Maven to add workers to the jobs, increasing Maven's labor costs. Maven provided testimony that back charges for these labor costs had a "pretty devastating" impact on their business. Coupled with the Magnum's delays in making payments to Maven, Maven could not pay its suppliers, and inevitably Maven had to discontinue the jobs. Although there was some evidence Gamma and another general contractor provided construction schedules, this evidence did not conclusively establish that Magnum provided Maven with a construction schedule for either Magnum's or Maven's portion of the projects.

Maven also provided testimony that they were not paid for the work they did on the two Katy projects for the months of February, March, or April. Testimony and other evidence also established Magnum did not pay Maven for work it performed in January and February for Creekside. Finally, on the St. Luke's project, the evidence established that Magnum did not pay Maven for its February work. The only money Maven sought in the lawsuit was for work it had already performed in these months for which it was never paid. Maven further explained that they credited Magnum for any outstanding amounts Magnum paid to their suppliers or for additional labor and admitted documents showing credits to Magnum for those

42

items. The jury heard conflicting accounts about whether Magnum tendered payment for some of these months and Maven rejected those payments or whether Magnum refused to deliver the checks it had prepared for those months only after Maven advised Magnum it could not continue on the jobs after April 20. However, Magnum did not dispute that it failed to pay these amounts, rather it attempted to justify its nonpayment.

Evidence showed that Maven had unpaid invoices from some of its suppliers dating from December. Tunning testified and emails admitted at trial showed Magnum advised Maven in January they would be withholding payment and auditing the account, which the contract permitted them to do. However, additional documentary evidence at trial showed that Magnum did not receive intent to lien letters from suppliers until May, long after Magnum withheld payment from Maven.

Magnum's own witnesses testified that it did not comply with the "pay when paid" provision of the contract for these projects. However, Magnum attempted to establish it was excused from doing so because (1) Maven failed to pay certain of its suppliers, and (2) payments from the general contractors for its own payment applications were delayed for February and March, due to problems caused by Maven. Magnum's primary testimony at trial went to show that Maven was behind schedule, failed to adequately staff the jobs, failed to pay suppliers, and based on this, it was entitled to withhold funds under the terms of the contract. Magnum's

43

witnesses also admitted that it did not provide a construction schedule to Maven but admitted evidence showing that its contract with the general contractor was made part of each of these agreements, and the general contractor's construction schedule was attached. Maven denied ever receiving a copy of the contract between Magnum and the general contractor with the attached schedule.

It is the jury's role to weigh the witnesses' credibility and resolve conflicts in their testimony. *See Anderson*, 550 S.W.3d at 616. The jury was free to weigh the competing evidence and conclude that Magnum's failure to provide a construction schedule on these jobs was a material breach, and that if there was no schedule provided, Magnum's complaints regarding Maven's delays and inadequate staffing were unfounded, meaning their withholding of funds would not be warranted under the contract. Having determined the evidence was legally and factually sufficient to support the jury's findings that Magnum breached the agreements first, we overrule this issue.

**2. No Damages**

Magnum argues that Maven did not dispute it walked off the job before completion or that it failed to pay vendors and that such facts "would have necessarily triggered a finding of damages in some amount." We disagree. We have concluded the evidence was legally and factually sufficient to show that Magnum breached the agreements first.

44

Nevertheless, testimony established that even with Maven leaving the jobs before completion, Magnum suffered no liquidated damages and never advised Maven of any delay damages. Maven also provided testimony that crediting Magnum for the additional labor amounts Magnum deducted from their contract amount, and after crediting Magnum for amounts Magnum paid to various suppliers on its behalf, Maven still suffered damages as presented to the jury. The jury is the sole judge of the witnesses and the weight to be given their testimony. *City of Keller*, 168 S.W.3d at 819. Viewing this evidence in the light most favorable to the jury's finding, we conclude it was legally sufficient. *See id.* at 824; *see also Del Lago Partners*, 307 S.W.3d at 770.

Although exhibits and testimony showed Magnum paid for labor to complete the jobs after Maven left, there was nothing in the record to establish those costs were reasonable. *See Mustang Pipeline*, 134 S.W.3d at 201 (explaining that despite evidence of "out-of-pocket costs, such evidence alone did not establish that the damages were reasonable and necessary"). Further, the record shows the general contractor paid Magnum for those additional amounts, and Magnum did not pay the balance of any remaining amounts on the contracts to Maven for work performed after Maven left the job in April. Likewise, with respect to the additional manpower Magnum required Maven to supply while they were still on the jobs, Magnum deducted those additional labor charges from the overall contract price it had to pay

45

Maven, so the jury could have inferred Magnum suffered no damages for those labor costs. Further, Janecek testified that several suppliers took judgments against them, for which they were still paying. Tunning's email to Janecek admitted at trial made clear that Magnum would only pay for supply costs after Maven left the jobs. The jury could have reasonably concluded that Magnum did not have to pay the costs for supplies Maven incurred prior to leaving the jobs. Documentary evidence established that Magnum was paid the full contract price for each of these jobs, and for the two Katy school projects they were actually paid a higher amount than was originally agreed. The jury was free to resolve conflicts in testimony and weigh the witnesses' credibility. *See City of Keller*, 168 S.W.3d at 819. "[W]hen reasonable jurors could resolve conflicting evidence either way, we presume they did so in accordance with the verdict." *Gunn v. McCoy*, 554 S.W.3d 645, 665 (Tex. 2018) (citing *City of Keller*, 168 S.W.3d at 820); *see also Golden Eagle Archery, Inc. v. Jackson,* 116 S.W.3d 757, 761 (Tex. 2003). We cannot say that the evidence is so weak or the jury's findings so contrary to the great weight and preponderance of the evidence as to render the verdict clearly wrong and unjust. *See Dow Chem. Co.*, 46 S.W.3d at 242. Accordingly, the evidence was factually sufficient to support the jury's findings that Magnum suffered no damages.

Because the evidence was legally and factually sufficient to support the jury's findings that Magnum sustained no damages, we overrule this issue.

46

**B. Issue Two: Conflicting Jury Answers**

In its second issue, Magnum complains that the jury's answers to questions 25A and 27A regarding a good faith dispute contained fatally conflicting answers. The Texas Supreme Court has determined that the "entry of a judgment based on fatally conflicting jury answers does not constitute fundamental error" and a party must preserve error. *USAA Tex. Lloyds Co. v. Menchaca*, 545 S.W.3d 479, 519 (Tex. 2018) "[T]o preserve error based on fatally conflicting jury answers, parties must raise that objection before the trial court discharges the jury." *Id.* at 518; *see also* Tex. R. Civ. P. 295 (noting that for conflicting answers, the trial court shall instruct the jury in writing in open court of the nature of the conflict, provide the jury with appropriate instructions, and retire the jury for further deliberations). Magnum did not object to any conflict between the jury's answers prior to the jury being discharged, and consequently, failed to preserve error with respect to any conflict. *See Menchaca*, 545 S.W.3d at 518.

**C. Issues Three and Four**

Magnum contends in its final issues that if we determine the evidence was legally and factually insufficient to support that it breached the contract first and that it sustained no damages, the derivative bond claims and attorney's fee award cannot stand. Given our determination that the evidence was legally and factually sufficient to support the jury's findings that Magnum materially breached the contracts first

and that it sustained no damages, we need not address issues three and four. *See* Tex. R. App. P. 47.1.

## IV. Conclusion

Having determined the evidence was legally and factually sufficient to support the jury's findings that Magnum materially breached the contracts first and that Magnum suffered no damages, the trial court did not err by denying Magnum's motion for new trial. Further, Magnum failed to preserve its claim that the jury provided conflicting answers. Accordingly, we affirm the trial court's judgment. Judgment is rendered against the sureties on the Appellants' supersedeas bond for the performance of the judgment and for costs rendered against the Appellants. *See* Tex. R. App. P. 43.5.

AFFIRMED.

_____
CHARLES KREGER
Justice

Submitted on November 9, 2021
Opinion Delivered March 17, 2022

Before Golemon, C.J., Kreger and Johnson, JJ.